## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL FLETCHER, | : | Civ. No. 16-1908 (KM) (MAH) |
| Plaintiff, | : |  |
| v. | : | **OPINION** |
| SUSSEX COUNTY, *et al.*, | : |  |
| Defendants. | : |  |

## KEVIN MCNULTY, U.S.D.J.

### I.    INTRODUCTION

The plaintiff in this civil rights matter, Michael Fletcher, represented by counsel, avers that various individuals associated with Keogh Dwyer Correctional Facility (the "Facility" or "Keogh Dwyer") were deliberately indifferent to his serious medical needs, in violation of 42 U.S.C. § 1983. (*See* DE 1.) Now before the court is the motion for summary judgment brought by defendants Sussex County, Sussex County Sheriff's Office, Warden Homer E. Wanamaker, Sr., and the Facility itself (collectively, the "Sussex Defendants").[1] (DE 30.) For the reasons stated herein, motion will be granted.

### II.   BACKGROUND

On April 2, 2014, at 3:24 p.m., Fletcher, who was then incarcerated at Keogh Dwyer, was sent to Saint Clare's Hospital in Dover, New Jersey, for emergency treatment of his "infected and diseased sinuses which ultimately extended into [his] left orbit." (*See* Fletcher's Mar. 17,

---

[1]      The Sussex Defendants are so designated to distinguish them from the only other named defendants, who are all anonymous "John Doe" persons or entities. Because the John Does have never been named as defendants or served, the case will be dismissed as to them.

2018 Expert Report, DE 31-12 at 224;[2] *accord* Keogh Dwyer's Apr. 2, 2014 Med. Progress Notes, DE 31-5 at 185.) There is no dispute that Fletcher thereafter "required two [offsite] surgeries to resolve the underlying infection." (*See* Fletcher Opp. Br. 1, DE 32.) Fletcher's present § 1983 action is rooted in his assertion that but for the "[Sussex] Defendants' [improper] delay in having Mr. Fletcher evaluated by a doctor . . . , he would not have needed [a second surgery] to resolve the infection." (*See id.*)

### a. Factual Background

The documents and other record evidence establish the following facts beyond reasonable dispute: On August 30, 2013, Fletcher, who was not then imprisoned,[3] fell down a set of stairs and fractured several bones in his face. (*See* Newton Med. Ctr. Aug. 30, 2013 Report, DE 31-5 at 179; Fletcher's June 28, 2017 Dep. Tr. 16-17, DE 31-4.) On the same day, Fletcher went to Newton Medical Center (not a prison or prison-related facility). There he was diagnosed with "comminuted displaced fractures[4] of his left orbital lateral and inferior walls" and "comminuted displaced fractures of the left maxillary sinus lateral and anterior walls." (*See* DE 31-5 at 179.)

Approximately ten days later, on September 8, 2013, while still suffering from his injuries, Mr. Fletcher was arrested for a probation violation and taken to Keogh Dwyer. (Fletcher Dep. Tr. 20-21, DE 31-4; *accord* Keogh Dwyer Sept. 8, 2013 Med. Progress Notes, DE 31-16 at 260.) Fletcher was detained at the Facility for roughly one and a half months and released in late

---

2    Unless otherwise specified, page citations within docket entries refer to the official docket "PageID:" number.

3    Fletcher has been incarcerated at Keogh Dwyer on several separate occasions, including from early-September 2013 through late November 2013, and from December 31, 2013 through April 2, 2013.

4    In a comminuted fracture, "the bone is broken into pieces." In a displaced fracture, the "bone fragments on each side of the break are not aligned." *See* www.mayoclinichealthsystem.org/locations/mankato/services-and-treatments/orthopedic-surgery/fracture-care-and-trauma.

November 2013. (Fletcher Dep. Tr. 21, DE 31-4.) The Facility's contemporaneous medical records show that Fletcher was examined by Keogh Dwyer medical staff upon his arrival there in early September 2013, and that during that examination, Fletcher reported his pre-incarceration August 30, 2013 injuries to medical staff. (*See* DE 31-16 at 260.) In response, the Facility's medical department obtained Fletcher's August 30, 2013 medical records from Newtown Medical Center. (*See generally* DE 31-16.) On September 10, 2013, the medical staff prescribed an antibiotic, Augmentin,[5] to Fletcher. (*See* Keogh Dwyer Sept. 10, 2013 Physician Orders, DE 31-16 at 247.) Medical personnel also advised Fletcher that he should "notify [the on-site nurse] of any medical condition which develops while incarcerated." (*See* Keogh Dwyer's Sept. 9, 2013 Med. Record, DE 31-16 at 244.)[6] Despite this invitation, Fletcher never made any formal requests for medical treatment at Keogh Dwyer – or otherwise required any emergent medical care – when he was incarcerated there between early September 2013 and late November 2013. (*See* Sussex Def. Statement of Facts ("SOF") ¶ 14, DE 31-1; Fletcher Dep. Tr. 48, DE 31-4.)

After his release in late November 2013, Fletcher remained free for only about a month. On December 31, 2013, Fletcher was again arrested for violating probation and was again taken

---

[5] *See* Nurse Acker's Oct. 16, 2017 Dep. Tr. 44-45, DE 31-15 (testifying that Augmentin is an antibiotic and confirming that it is used to treat infections).

[6]     There is abundant record evidence which demonstrates that Keogh Dwyer medical staff: (i) made themselves readily available to all inmates, including Fletcher; (ii) were receptive and responsive to inmates' medical complaints; and (iii) exercised independent medical judgment in their evaluation and treatment of inmates. (*See, e.g.*, Sussex Def. SOF ¶¶ 87-94; Fletcher Resp. to SOF ¶¶ 87-94, DE 32 (Fletcher conceding, among other things, that Keogh Dwyer's nurses made rounds in the Facility three times a day, that he could bring any kind of medical complaints to the nurses' attention, and that if a nurse decided, in her medical judgment, that Fletcher needed to see a doctor, he would see a doctor); *accord* Wilfred Puentes' July 18, 2017 Dep. Tr., DE 31-10 (testifying about Keogh Dwyer's medical policies, procedures, and practices); Nurse Kajogo's Oct. 16, 2017 Dep. Tr., DE 31-14 (testifying about her work as a nurse at the Facility); Officer Aumick's July 18, 2017 Dep. Tr., DE 31-8 (testifying about Keogh Dwyer's medical policies, procedures, and practices).) Likewise, there is nothing in the record which suggests that Fletcher was prohibited or discouraged from submitting medical grievances at any point during his periods of confinement at the Facility.

3

to Keogh Dwyer.[7] (*See* Keogh Dwyer Dec. 31, 2013 Inmate Med. Info. Form, DE 31-5 at 181.) When Fletcher arrived at Keogh Dwyer on December 31, 2013, he advised the Facility's medical personnel that he was not sick or hurt. (*See id.*)

On January 9, 2014, Mr. Fletcher submitted a written sick call request to the Facility's medical staff in which he complained about "hav[ing] severe cold symptoms" and requested "decongestant cold medicine." (*See* DE 31-6 at 187.) At 8:35 p.m. on that same date, Maria Kajogo, a nurse at the Facility, met with Fletcher. (*Id.*) Nurse Kajogo noted that Fletcher's temperature was then 97.9 degrees and that she advised Fletcher to treat his cold-like symptoms with nasal spray, Tylenol, and by gargling salt. (*Id.*) The nurse also told Fletcher to inform "medical staff of any worsening symptoms." (*Id.*)

On January 23, 2014, Fletcher submitted another sick call request in which he reported having a "runny nose, sore throat, headache, sneezing, and also coughing." (*See* DE 31-6 at 189.) At 7:30 a.m. on that date, a member of the Facility's medical staff met with Fletcher. (*Id.*) That individual observed that Fletcher's temperature was then 98.3 degrees, that his throat was "slightly red," that he was congested, and that there was a "moderate [amount of] nasal drainage." (*Id.*) That individual recommended Tylenol and nasal spray to treat Fletcher's symptoms. (*Id.*)

Fletcher's January 9, 2014 and January 23, 2014 sick call requests are the only two written requests for medical treatment that Fletcher submitted between December 31, 2013 and March 28, 2014. Other evidence in the record likewise suggests that Fletcher appeared to be in good health during this period. For example, on various dates between February 2, 2014 and

---

[7]     The parties agree that Fletcher's stint at Keogh Dwyer beginning on December 31st "was not as a pretrial detainee [because Fletcher was then] serving a 90-day sentence for violating probation." (Sussex Def. SOF ¶ 17; Fletcher Resp. to SOF ¶ 17.)

March 26, 2014, Fletcher was one of a handful of inmates who would leave the Facility to "perform various [offsite] work details for nonprofit organizations and government entities" as part of Keogh Dwyer's "SWAP" program. (*See* Officer Aumick July 18, 2017 Dep. Tr. 6-10, DE 31-8; *accord* SWAP calendar entries, DE 31-9.) On February 14, 2014, Fletcher – as part of his SWAP duties – shoveled snow outside of Keogh Dwyer. (*See* Aumick Feb. 14, 2014 Letter, DE 31-13.) At approximately 7:40 a.m. on that date, another inmate inadvertently hit Fletcher in the head with a shovel. Fletcher declined medical attention and instead "continued to shovel snow and work diligently until approximately 2:00 p.m." (*See id.*)

On March 28, 2014, Fletcher submitted a sick call request in which he complained of having a "runny nose, sneezing, sore through, cough and headaches [for] the past 2 days." (*See* DE 31-7 at 191; *accord* Sussex Def. SOF ¶ 22; Fletcher Resp. to SOF ¶ 17.) Fletcher requested only a decongestant to treat these symptoms. (*See* DE 31-7 at 191.) That request was reviewed by medical personnel at the Facility at 7:50 a.m. on March 28th. (*Id.*) Medical personnel formally responded within two hours, at 9:40 a.m. (*Id.*) At that time, Fletcher received nasal spray and Motrin, was told to rest and increase his fluid intake, and was also prescribed chlorpheniramine and acetaminophen. (*See id.*; Keogh Dwyer Mar. 28, 2014 Physician Orders, DE 31-17 at 266; Sussex Def. SOF ¶ 23; Fletcher Resp. to SOF ¶ 23.)

As of March 28, 2014, there is no record of a medical problem requiring more than routine treatment. That changed, however, on April 1, 2014. Fletcher testified that when he woke up on that day, his "symptoms fully just went crazy"; at that time, his "[left] eye swelled shut and [he] had a high fever of 103." (Fletcher Dep. Tr. 32, 91, DE 31-4; *accord* Keogh Dwyer Apr. 1, 2014 Med. Progress Notes, DE 31-5 at 183.) At 8:00 a.m., a Keogh Dwyer nurse, Bonnie Queen, met with Fletcher. (*See* Sussex Def. SOF ¶¶ 26-27; Fletcher Resp. to SOF ¶¶ 26-27; *accord* DE

31-5 at 183.) Nurse Queen's contemporaneous notes confirm that when she saw Fletcher on the morning of April 1, 2014, the left side of his face was swollen and he had a temperature of 103.1 degrees. She also noted that Fletcher complained of "nasal congestion and facial swelling" and reported that he had "had a cold for a few days." (*See* Sussex Def. SOF ¶ 26; Fletcher Resp. to SOF ¶ 26; *accord* DE 31-5 at 183; Nurse Acker Oct. 16, 2017 Dep. Tr. 44, DE 31-15.)

Nurse Queen then contacted a Keogh Dwyer physician, Dr. Fielding, for orders. (*See* Keogh Dwyer Apr. 1, 2014 Med. Progress Notes, DE 31-5 at 183.) Dr. Fielding responded to Nurse Queen twelve minutes later, at 8:12 a.m., and formally prescribed Fletcher an antibiotic, Augmentin, as well as Motrin, at 8:20 a.m. on April 1, 2014. (*See id.*; Keogh Dwyer's Apr. 1, 2014 Physician Orders, DE 31-17 at 267.) Nurse Queen also then segregated Fletcher from the rest of Keogh Dwyer's inmates, *i.e.*, placed him in "med lock." (*See* Sussex Def. SOF ¶ 24; Fletcher Resp. to SOF ¶ 24; *accord* Fletcher Dep. Tr. 32, DE 31-4 ("Med lock is where they think it's contagious because the nurse thought I had pink eye."). Fletcher remained "in med lock until he was seen by a doctor and taken to the hospital." (*See* Sussex Def. SOF ¶ 24, Fletcher Resp. to SOF ¶ 24.)

On the evening of April 1, 2014, at 7:30 p.m., another Keogh Dwyer nurse, Bonnie Acker, met with Fletcher. (*See* Keogh Dwyer Apr. 1, 2014 Med. Progress Notes, DE 31-5 at 183; Nurse Acker Dep. Tr. 44, DE 31-15.) Nurse Acker's corresponding medical notes indicate that Fletcher's temperature had then dropped to 100.9 degrees, but that the area around his left eye remained swollen shut. (*See* DE 31-5 at 183.)

On the following day, April 2, 2014, at 1:45 p.m., Fletcher was evaluated by Keogh Dwyer medical personnel for the third time in just under thirty hours. He was then diagnosed by

a nurse practitioner as potentially having periorbital cellulitis and possible septicemia.[8] (*See* Sussex Def. SOF ¶ 98; Fletcher Resp. to SOF ¶ 98; Keogh Dwyer Apr. 2, 2014 Med. Progress Notes, DE 31-5 at 184.) At that time, it was determined that Fletcher would need to be sent "to the [emergency room] for further evaluation." (*See* DE 31-5 at 184.) The Facility's medical records indicate that Fletcher left Keogh Dwyer at 3:24 p.m. on April 2, 2014 for treatment at Saint Clare's Hospital in Dover, New Jersey. (*See id.*) The Facility's medical records also demonstrate that in the following days, Keogh Dwyer medical staff continued to follow up with Saint Clare's hospital personnel about Fletcher's case. (*See* Keogh Dwyer Apr. 3, 2014 and Apr. 4, 2014 Med. Progress Notes, DE 31-5 at 185.)

In sum, the record makes clear that: (i) Fletcher's medical condition did not present as emergent or even serious until the morning of April 1, 2014; (ii) Keogh Dwyer medical personnel examined Fletcher on at least two separate occasions on April 1, 2014, and at least once on April 2, 2014; and (iii) within thirty-six hours of meeting with Nurse Queen on the morning of April 1, 2014, Fletcher was transported to the emergency room at Saint Clare's Hospital. (*Accord* Fletcher Dep. Tr. 31, DE 31-4 ("they put me in med lock for a day and a half until I guess the doctor showed up and then she saw me and said, he needs to go to the hospital right away."). In light of these facts, it is unsurprising that Fletcher's own medical expert, Dr. Carl A. Mazzara, concluded that "the records show proper care, treatment and diagnosis of the medical personnel at the Keogh-Dwyer facility. The staff quickly noted that [Fletcher] had a serious problem and within 24 hours or so he was being transferred and treated at St. Claire's Hospital." (*See* DE 31-12 at 223.)

---

[8]     It appears that Fletcher was eventually diagnosed as having "infected and diseased sinuses which ultimately extended into the left orbit." (*See* Fletcher's Expert Report, DE 31-12 at PageID: 224.)

### b. Procedural History

Fletcher initiated this action in the Superior Court of New Jersey on February 29, 2016. (*See* Fletcher's Compl., DE 1-2 at 8.) In addition to the Sussex Defendants, Fletcher's complaint also names several classes of Facility-related John Doe defendants, consisting of otherwise unidentified correctional officers, nurses, doctors, administrators, and entities. In Counts I, II, III, and IV, Fletcher asserts that the defendants failed to provide him with adequate medical attention and treatment, in violation of his rights under the United States Constitution.[9] (DE 1-2 at 11-13.) In Counts VI and VII,[10] he asserts state law claims of medical malpractice. On April 6, 2016, the Sussex Defendants removed this action to federal court. (DE 1.)

On June 27, 2017, Fletcher consented to the dismissal with prejudice of Counts VI and VII, *i.e.*, his only non-§1983 claims. (*See* Fletcher June 27, 2017 Letter and Proposed Consent Order, DE 18.) On June 28, 2017, I formally dismissed both of those state law claims with prejudice. (*See* June 28, 2017 Consent Order, DE 19.)

On July 26, 2018, the Sussex Defendants filed their Rule 56 motion for summary judgment.[11] (DE 30, 31.) Defendants' motion includes, among other things, a statement of facts which are said to be undisputed. (DE 31-1.) As is proper, each such fact is cited to a specific portion of the evidentiary record appended to the motion. *See* L. Civ. R. 56.1(a) ("On motions

---

[9]      In each of these counts, Fletcher specifically claims that defendants violated his "right to substantive due process protected under the Fourteenth Amendment to the United States Constitution." (DE 1-2 at 11-13.) As noted *infra*, because Fletcher's detention at Keogh Dwyer beginning on December 31, 2013 was not as a pretrial detainee, but as a convicted prisoner, his right to medical care instead arises under the Eighth Amendment. That said, this distinction is immaterial for purposes of resolving the present summary judgment motion.

[10]      There is no Count V. (*See* DE 1-2.)

[11]      The Sussex Defendants' summary judgment motion has been filed under seal. (*See* Jan. 8, 2019 Order, DE 37.) On February 5, 2019, the Sussex Defendants filed an unsealed, redacted version of that motion. (*See* DE 38.)

for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion.").

Mr. Fletcher filed his opposition to the motion on August 21, 2018. (DE 32.) Fletcher's opposition consists of a brief, his response to the Sussex Defendants' Rule 56.1 statement of facts, and his own counterstatement of material facts. (*See id.*) Fletcher has not submitted any additional evidence for the court's consideration; *i.e.*, he relies on the evidentiary materials submitted by the Sussex Defendants. Although Fletcher at times generally denies the truth and accuracy of some of the Sussex Defendants' stated facts (*see id.* at 272-75), he fails to cite to specific portions of the record evidence in support of those denials. *See* L. Civ. R. 56.1. ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."). I have given the matter due consideration and, as required, I have examined the record as a whole. Where I have found no countervailing evidence, however, properly supported factual statements have been treated as undisputed.

On August 28, 2018, the Sussex Defendants filed their reply (at DE 33), as well as their response to Mr. Fletcher's counterstatement of material facts (at DE 33-1).

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *Id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . . , affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable

minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## IV. ANALYSIS

### a. Section 1983 Inadequate Medical Care Claims

As noted above, Fletcher asserts that various personnel at Keogh Dwyer – including the Sussex Defendants – acted with deliberate indifference to his serious medical needs when he was incarcerated at the Facility. This claim is actionable under federal law pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

> Every person[12] who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

---

[12]    I note that Keogh Dwyer itself is not itself a "person" subject to suit under Section 1983. *See Parrish v. Ocean Cnty. Jail*, No. 13-2020, 2013 WL 5554687, at *2 (D.N.J. Sept. 20, 2013) (holding that Ocean County Jail is not a person subject to suit under 42 U.S.C. § 1983) (citations omitted); *accord Ross v. Burlington Cty. Jail*, No. 12-338, 2013 WL 3514191, at *2 (D.N.J. July 11, 2013) (citations omitted); *Ruiz v. Stills*, No. 09-4259, 2012 WL 762166, at *4 (D.N.J. Mar. 7, 2012) (citations omitted). Irrespective of the merits, then, I would be constrained to grant summary judgment in favor of Keogh Dwyer Correctional Facility.

42 U.S.C. § 1983.

To obtain relief under this statute, a plaintiff must establish: (i) that one of his rights secured by the Constitution or laws of the United States was violated; and (ii) that this violation was caused or committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (noting that Section 1983 does not provide substantive rights; rather, it provides a vehicle for vindicating violations of other federal rights).

In the seminal decision of *Estelle v. Gamble*, 429 U.S. 97 (1976), the United States Supreme Court established the essential principles governing a prisoner's § 1983 claim based on inadequate medical care: (i) "the government [is obligated] to provide medical care for those whom it is punishing by incarceration"; (ii) "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment"; (iii) prison officials violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs by "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed"; and (iv) "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."[13] *Id.* at 103-05.

Medical needs that are sufficiently "serious" under this standard include "one[s] . . . diagnosed by a physician as requiring treatment or one[s] that [are] so obvious that a lay person

---

[13]     Non-convicted pretrial detainees are afforded substantially the same protections under the Due Process Clause of the Fourteenth Amendment. *See Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005) ("pretrial detainees' [are protected] from 'punishment' under the Fourteenth Amendment, and convicted inmates [are protected] from punishment that is 'cruel and unusual' under the Eighth Amendment."). That said, the parties agree that Fletcher's stint at Keogh Dwyer beginning on December 31, 2013 "was not as a pretrial detainee [because Fletcher was then] serving a 90-day sentence for violating probation." (Sussex Def. SOF ¶ 17; Fletcher Resp. to SOF ¶ 17.)

would easily recognize the necessity for a doctor's attention." *Mattern v. City of Sea Isle*, 657 F. App'x 134, 139 (3d Cir. 2016) (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). A prison official acts with deliberate indifference to those needs if he or she"knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016) (citation omitted).

In accordance with the *Estelle* line of cases, Mr. Fletcher's Section 1983 deliberate indifference claim will survive summary judgment only if he "make[s] (1) a subjective showing that 'the defendants were deliberately indifferent to [his] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017). In other words, the evidence, when viewed in the light most favorable to Fletcher, "must demonstrate acts or omissions by prison officials that indicate deliberate indifference to a serious medical need." *Guiddy v. Terhune*, 90 F. App'x 592, 597 (3d Cir. 2004) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Pearson*, 850 F.3d at 536 (holding that, on a § 1983 claim of deliberate indifference to medical needs, "the party moving for summary judgment may satisfy Rule 56" by demonstrating that "the nonmoving party's evidence is insufficient to establish an essential element of [that] claim") (citing *Celotex*, 477 U.S. at 331).

There are several additional caveats, or limitations, on a § 1983 claim of deliberate indifference to medical needs. First, "prisoners do not have a constitutional right to limitless medical care." *Brown v. Beard*, 445 F. App'x 453, 456 (3d Cir. 2011). Instead, "the state is obligated to provide [prisoners with] basic health care." *Reynolds v. Wagner*, 128 F.3d 166, 173

(3d Cir. 1997); *see also Brown*, 445 F. App'x at 455 ("The Eight Amendment mandates that prisoners receive access to basic medical treatment.") (citing *Estelle*, 429 U.S. at 104).

Second, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227-28 (3d Cir. 2017); *accord United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) ("[w]here a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

Third, "when medical care is provided, [courts] presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson*, 850 F.3d at 535; *accord Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("it is well established that as long as a physician exercises professional judgment [the physician's] behavior will not violate a prisoner's constitutional rights"); *Lanzaro*, 834 F.2d at 346 ("mere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation"); *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("the propriety or adequacy of a particular course of treatment . . . remains a question of sound professional judgment.").

Fourth, "there are [nevertheless] circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic*, 854 F.3d at 228. "[P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Id.* (citations and internal quotations omitted). They cannot "deny reasonable requests for medical treatment . . . [when]

such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Id.*

(citing *Lanzaro*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

And, "knowledge of the need for medical care may not be accompanied by the intentional refusal

to provide that care." *Id.* (citations and alterations in original omitted).

### b. Application

Fletcher has demonstrated that as of April 1, 2014, his medical needs were sufficiently

serious for purposes of obtaining relief under Section 1983. Again, serious medical needs under

*Estelle* include "one[s] . . . diagnosed by a physician as requiring treatment or one[s] that [are] so

obvious that a lay person would easily recognize the necessity for a doctor's attention." *Mattern*,

657 F. App'x at 139 (quoting *Lanzaro*, 834 F.2d at 347). Fletcher was diagnosed with such a

condition and was transferred from Keogh Dwyer to the emergency room at St. Clare's Hospital

on the following day, April 2, 2014. There, he remained hospitalized until at least April 10, 2014,

during which time two surgeries were performed on him to address "the infected and diseased

sinuses which ultimately extended into [his] left orbit." (*See* Fletcher's Expert Report, DE 31-

12.)

I must also conclude, however, that the severity of Fletcher's condition did not manifest

itself as "serious" for purposes of *Estelle* at any time before April 1, 2014. His complaints

through March 2014 were routine; it was only on the morning of April 1, by Fletcher's own

admission, that his "symptoms fully just went crazy." (Fletcher Dep. Tr. 32, DE 31-4.) The

Sussex Defendants have properly drawn the only reasonable inference from the evidence: that

prior to April 1, 2014, "[Fletcher's] symptoms were not so obvious . . . as he [at all times prior to

that date] described such as cold symptoms." (Sussex Def. Summ. J. Br. 13, DE 31.) That record

undisputedly shows (i) that Fletcher did not file any formal medical grievances at the Facility

15

when he was incarcerated there for about one and half months in late 2013; (ii) that he filed two sick call requests complaining of cold-like symptoms in the weeks after he returned to Keogh Dwyer on December 31, 2013 (*see* DE 31-6); (iii) that Keogh Dwyer medical staff promptly responded to Fletcher's January 9, 2014 and January 23, 2014 sick call requests (*see id.*); (iv) that between January 23, 2014 and March 28, 2014, Fletcher did not file any formal medical complaints at Keogh Dwyer; and (v) that Fletcher felt well enough to perform SWAP-related work through March 26, 2014 (*see* Aumick Dep. Tr. 6-10, DE 31-8; SWAP calendar entries, DE 31-9.).

In Fletcher's last pre-April 1 sick call request, on March 28, 2014, he complained only of "a runny nose, sneezing, sore throat, and headaches for the past two days." He requested only a nasal decongestant. (DE 31-7.) Fletcher's March 28, 2014 complaints were the same cold-like ailments that Fletcher had complained of – and was treated by medical personnel at the Facility for – in January 2014. Nor did the medical personnel at the Facility respond tardily to Fletcher's March 28, 2014 sick call request; they arrived within two hours, by 9:40 a.m.. (*Id.*; DE 31-17 at 266.) At that time, Fletcher received nasal spray and Motrin, was told to rest and increase his fluid intake, and was separately prescribed chlorpheniramine and acetaminophen. (*See id.*) The evidence before me is undisputed that it was only on April 1, 2014 that Fletcher's "[left] eye swelled shut and [he] had a high fever of 103." (Fletcher Dep. Tr. 91, DE 31-4; *accord* Keogh Dwyer Apr. 1, 2014 Med. Progress Notes, DE 31-5 at 183.)

Affording Fletcher all favorable inferences, the record evidence demonstrates that Fletcher's complaints presented as relatively minor and susceptible to routine treatment until April 1, 2014. Fletcher has therefore failed to demonstrate that his medical needs prior to April 1, 2014 were sufficiently "serious" for purposes of establishing entitlement to relief under § 1983.

*Hall v. Holsmith*, 340 F. App'x 944, 947, n.3 (4th Cir. 2009) ("the symptoms Hall complained of[, *i.e.*, fever, body aches, sinus congestion, and sore throat,] do not amount to a serious medical need"); *Smith v. Montefiore Med. Ctr.-Health Servs. Div.*, 22 F. Supp. 2d 275, 281 (S.D.N.Y. 1998) ("Basically, plaintiff went to the clinic with cold-like symptoms for which he was given cough syrup and eye solution. Hence, his immediate medical needs were not sufficiently serious to invoke the protections of the Eighth Amendment."); *Schwartz v. Jones*, No. 99–3269, 2000 WL 1859012, at *3 (E.D. La. Dec. 18, 2000) (holding "flu-like symptoms" and head cold were not serious medical needs).

The next question is the appropriateness, or not, of the Sussex Defendants' response when, on April 1, 2014, they were first presented with a "serious" medical condition. The evidence, I find, is unrebutted that the defendants responded correctly and *a fortiori* were not deliberately indifferent to Mr. Fletcher's medical needs.

The Sussex Defendants accurately report that the evidence is one-sided that "[o]nce [Fletcher's] symptoms 'went crazy' [on April 1, 2014,] he was quickly evaluated, diagnosed and transported to St. Clare's." (Sussex Def. Summ. J. Br. 13, DE 31.) It is undisputed that shortly after Fletcher woke up on April 1, 2013, he met with Nurse Queen, who, at 8:00 a.m., noted the severity of his condition, segregated him from the rest of the inmates at the Facility, and immediately contacted a physician, Dr. Fielding, for further instructions, a process that took mere minutes. (DE 31-5.) Dr. Fielding responded to her by 8:12 a.m. By 8:20 a.m., Fletcher had been prescribed several medications for treatment, including an antibiotic. (*See id.*) That evening, at 7:30 p.m., Nurse Acker met with Fletcher for the second time that day to reassess his condition. (*Id.*) The following day, April 2, 2014, at 1:45 p.m., Fletcher was seen by a third medical professional at the Facility. That professional concluded that he needed to be sent to an

offsite hospital for treatment. (*Id.*) Within approximately one and one half hours, at 3:24 p.m., Fletcher left Keogh Dwyer and was transported to the emergency room at St. Clare's Hospital. (*See, e.g., id.*)

The foregoing facts demonstrate that Fletcher received prompt and conscientious medical attention at Keogh Dwyer on April 1, 2014 and April 2, 2014. Facility personnel were not indifferent to his serious medical needs, but rather responded appropriately to them.

The opinion of Mr. Fletcher's own medical expert, Dr. Carl A. Mazzara, is in accord. Dr. Mazzara concluded that "the records show proper care, treatment and diagnosis of the medical personnel at the Keogh-Dwyer facility. The staff quickly noted that [Fletcher] had a serious problem and within 24 hours or so he was being transferred and treated at St. Claire's Hospital." (*See* DE 31-12 at 223.)

Overall—*i.e.*, not just in relation to April 1–2, 2014—the Sussex Defendants are correct that "[t]he undisputed records reveal[] that anytime [Fletcher] brought a medical concern to the attention of the [Facility's] medical staff, he was evaluated and treated." (Sussex Def. Summ. J. Br. 13, DE 31.) My conclusion that the Facility did not display deliberate indifference, but rather responded appropriately, extends to the pre-April 1 complaints of cold-like symptoms and the medical care that Fletcher received at Keogh Dwyer. I agree that, as to the entire period(s) of Fletcher's incarceration, "there is no evidence in the record[] that the defendants deliberately ignored a serious medical condition, or intentionally delayed medical treatment for non-medical reasons." (*Id.*)

These facts, as to which the evidence creates no genuine material issue, wholly undermine Fletcher's claims under Section 1983. *See Wisniewski v. Frommer*, 751 F. App'x 192, 196 (3d. Cir. Oct. 3, 2018) (plaintiff failed to allege a *prima facie* Eighth Amendment violation

where "[plaintiff's] allegations confirmed that he had been seen many times by medical providers who exercised professional judgment with respect to his care[.]") (quotations and alterations in original omitted); *Romero v. Ahsan*, No. 13-7695 (FLW), 2018 WL 6696782, at *18 (D.N.J. Dec. 20, 2018) (no constitutional violation where "the evidence before the Court demonstrate[d] that [plaintiff] received extensive and generally prompt medical treatment"); *Battle v. McGann*, No. 17-12041 (RBK), 2018 WL 5263279, at *4 (D.N.J. Oct. 23, 2018) ("In light of Plaintiff's multiple treatments and evaluations, it is apparent that the complaint shows only a [non-actionable] difference in opinion over the course of proper medical treatment rather than a complete denial of medical care."); *Wynn v. Mundo*, 367 F. Supp. 2d 832, 838 (M.D.N.C.), *aff'd*, 142 F. App'x 193 (4th Cir. 2005) (holding that one and one-half day delay between prisoner's first complaints of flu-like symptoms and his subsequent treatment and diagnosis of pneumonia by a physician did not constitute deliberate indifference by prison officials to that prisoner's health and safety); *Maynard v. New Jersey*, 719 F. Supp. 292, 295 (D.N.J. 1989) ("neither defendants' alleged negligent failure to diagnose decedent's AIDS affliction, nor defendants' allegedly inadequate decision to treat apparent cold symptoms with Tylenol and throat lozenges, without more, can rise to the level of a violation of decedent's § 1983 rights.").

Mr. Fletcher's primary argument in opposition to summary judgment is that he should have been seen by a doctor or nurse practitioner within twenty-four hours of filing his third sick call request on March 28, 2014. He derives that twenty-four-hour deadline from Sussex County Sheriff's Office Standard Operating Procedure 9.03(D) ("SOP 9.03(D)"). (*See* Fletcher Opp. Br. 9, DE 32 ("The most prevalent issue in this case is Defendants' disregard for [SOP 9.03(D)].").) The portion of SOP 9.03(D) which Fletcher relies on reads as follows:

> Any inmate who has been in sick call more than twice for the same unresolved complaint, but has not yet seen a physician/nurse practitioner, will be placed on the schedule within twenty four (24) hours to see the MD/NP.

(*See id.* at 7; *see also* SOP 9.03(D), DE 31-11.)

Fletcher points out that he filed sick call requests on January 9, 2014 and January 23, 2014, complaining of cold-like symptoms. Thus, he says, his March 28, 2014 sick call request represented his third sick call "for the same unresolved complaint" under SOP 9.03(D). (*Id.* at 6-7.) Therefore, he claims, SOP 9.03(D) mandated that he should have seen a physician or registered nurse within 24 hours, *i.e.,* by sometime on March 29, 2014. (*Id.* at 7.) Because that did not occur, he argues that the Court cannot grant summary judgment in favor of the Sussex Defendants on his § 1983 deliberate indifference claim. (*Id.*)

Fletcher's argument is problematic on a number of levels.

First, it is unclear whether the mandates of SOP 9.03(D) were even triggered by Fletcher's March 28, 2014 sick call request. Fletcher, for example, has not presented any medical evidence which substantiates that his January 9 and 23, 2014 sick call requests were related to the same "unresolved complaint." Fletcher's own expert report is inconclusive on this point. (*See* DE 31-12 at 224.)

Second, although the record is inconclusive on whether the person who saw Fletcher on March 28, 2014, was a registered nurse or physician, the record conclusively shows that Fletcher was in fact treated by Keogh Dwyer medical personnel on that date. (*See* DE 31-7.)

Third, Fletcher has not presented any evidence which suggests that he would have immediately been sent to the hospital for emergency treatment if he had met with a physician or registered nurse on March 29, 2014. (His symptoms, recall, had not become serious at that time.)

Fourth, even setting aside the three foregoing objections, the requirements of SOP 9.03(D) do not set forth the standard for § 1983 relief. That standard would require a showing by Mr. Fletcher that the Sussex Defendants were "deliberately indifferent to his medical needs." *Pearson*, 850 F.3d at 534. In other words, "the constitutional standard of deliberate indifference is not defined with respect to whether or not prison procedures were completely satisfied." *Swan by Carello v. Daniels*, 923 F. Supp. 626, 636 (D. Del. 1995). I therefore fully agree that "[t]he issue [before me on summary judgment] is whether the Facility's treatment of [Fletcher] demonstrates the kind of deliberate disregard for his medical needs as violates the constitution, not whether a standard operating procedure was violated." (Sussex Def. Reply 4, DE 33.)

That constitutional standard, as a matter of law, is not satisfied by this record. In light of the undisputed facts detailed above, I cannot find that any member of Keogh Dwyer's medical staff acted with constitutionally-actionable deliberate indifference to any of Fletcher's medical needs, serious and otherwise; this fact remains true regardless of whether SOP 9.03(D) was complied with. *Swan by Carello*, 923 F. Supp. at 636 (D. Del. 1995) ("prison officials who strive to provide a level of protection higher than that mandated by the Constitution should not be penalized simply because these goals are not met.").

No underlying constitutional violation occurred, then, with respect to the medical care and treatment Fletcher received while at Keogh Dwyer. Certain consequences follow.

First, summary judgment must be granted on Fletcher's § 1983 deliberate indifference claims against defendants Homer E. Wanamaker, Sr., Sussex County, and the Sussex County Sheriff's Office. Each of these defendants is sued in this action as a policy makers for Keogh Dwyer. (*See* DE 1-2 at 11-12.) But unless there was a constitutional violation, a policy maker cannot be liable for having contributed to one. *See Grazier ex rel. White v. City of Philadelphia*,

328 F.3d 120, 124 (3d Cir. 2003) (holding that when there are no underlying constitutional violations found, it precludes supervisory and policy-making liability). At any rate, Fletcher has failed to point to any evidence in the record "showing that (1) [any] custom, practice or procedure [of the Sussex Defendants] created an unreasonable risk of inadequate medical treatment; (2) the defendants were aware that the unreasonable risk existed; (3) the defendants were indifferent to that risk; and (4) the failure to provide adequate medical treatment resulted from the failure to employ the identified practice or procedure." *Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 228–29 (D.N.J. 2000) (setting forth evidentiary proofs that a § 1983 plaintiff must present to survive summary judgment with respect to claims that a pattern, practice or custom of defendants amounted to deliberate indifference to the right to adequate medical care). Fletcher's failure to point to any record evidence to substantiate any of these *prima facie* elements likewise supports entry of summary judgment in favor of defendants Wanamaker, Sussex County, and the Sussex County Sheriff's Office in their role as policy makers.

Second, to the extent Fletcher has additionally asserted a claim against Wanamaker in his role as supervisor of Keogh Dwyer's medical personnel (*see* DE 1-2 at 13), summary judgment is likewise appropriate. Wanamaker is not a medical professional and the record does not disclose that he possesses any medical training. On these facts, if Wanamaker were to be liable for deliberate indifference to medical needs in his supervisory role, it could only be because he was aware of or somehow abetted the deliberate indifference of medical personnel at the Facility. *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."). Once again, there is no evidence that such deliberate

indifference occurred at all, so there can be no liability for abetting or enabling it. Defendant Wanamaker, in his role as supervisor of medical personnel, did not violate Fletcher's constitutional rights. *See McGinnis v. Hammer*, 751 F. App'x 287, 293 (3d Cir. 2018) (affirming award of summary judgment against non-medical defendants because § 1983 plaintiff "failed to allege a constitutional violation, let alone one that the non-medical officials had a reason to be aware of"); *Serrano v. Folino*, 339 F. App'x 254, 258 (3d Cir. 2009) ("Absent viable claims that the medical defendants violated his constitutional rights, Serrano cannot state a claim against the non-medical defendants for failing to cure the medical defendants' conduct.").

Accordingly, I will enter summary judgment in favor of the Sussex Defendants on Fletcher's § 1983 claim of deliberate indifference to medical needs.

## V.  CONCLUSION

For the foregoing reasons, the Sussex Defendants' motion for summary judgment is granted. An appropriate Order will be entered.

DATED: March 26, 2019

KEVIN MCNULTY
United States District Judge